FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

N. D.; A. U.; C. K.; C. J.; M. D.;
B. A.; G. S.; T. F.; J. K., disabled
minors, through their parents
acting as guardians ad litem,
                *Plaintiffs-Appellants,*

                v.

STATE OF HAWAII DEPARTMENT OF
EDUCATION,
                *Defendant-Appellee.*

No. 09-17543

D.C. No.
1:09-cv-00505-
AWT-BMK

OPINION

Appeal from the United States District Court
for the District of Hawaii
A.Wallace Tashima, Senior Circuit Judge, Presiding

Argued and Submitted
February 10, 2010—Honolulu, Hawaii

Filed April 5, 2010

Before: Jerome Farris, Dorothy W. Nelson and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Farris

5167

**COUNSEL**

Carl M. Varady, Honolulu Hawaii; Stanley E. Levin and Susan K. Dorsey, Levin Education Access Project, Honolulu, Hawaii, for the plaintiffs-appellants.

Mark J. Bennett, Attorney General of Hawaii, and Dierdre Marie-Iha and Holly Shikada, Department of the Attorney General, Honolulu, Hawaii, for the defendant-appellee.

**OPINION**

FARRIS, Senior Circuit Judge:

N.D., et al., disabled minors enrolled in the State of Hawaii's public school system, alleging violations of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1487 (2006), appeal an order denying their motion for a preliminary injunction seeking to prevent Hawaii from shutting down public schools on seventeen Fridays and concurrently furloughing the teachers. We agree with the district court that the stay-put provision of the IDEA was not intended to cover system-wide changes in public schools that affect disabled and non-disabled children alike, and that such system-wide changes are not changes in educational placement. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343 (2006). We have jurisdiction under 28 U.S.C. § 1292(a)(1) (2006) to hear this interlocutory appeal. We affirm.

I.

The State of Hawaii is currently in the midst of a major fiscal crisis. To help alleviate the fiscal crisis, Hawaii decided to shut down the public schools for seventeen Fridays in the 2009-2010 school year. School children, disabled and non-disabled alike, would not attend school on those Fridays. The

elimination of those seventeen Fridays from the school calender constitutes a reduction in instructional days of approximately ten percent. Hawaii reached a negotiated agreement, covering the 2009-2010 and 2010-2011 school years, with the Hawaii State Teachers Association, the state teachers union, to implement furloughs of all public school teachers on the Fridays when the schools were closed. The first so-called "furlough Friday" was on October 23, 2009.

In response to the impending furloughs, N.D. requested a due process hearing on October 19, 2009 from the State of Hawaii Department of Education regarding the potential change in his individual educational program.[1] Along with this request, N.D. invoked the stay-put provisions of the IDEA. *See* 20 U.S.C. § 1415(j) (2006). Hawaii did not adjust the furloughs in response to the invocation of the stay-put provision and moved forward with the furloughs.

N.D. filed suit in district court on October 20, 2009, naming only the State of Hawaii Department of Education as a defendant. The plaintiffs included nine disabled children enrolled in five public schools. N.D. alleges that the furlough of the teachers and concurrent shutdown of the public schools violated his rights under the IDEA. Specifically, N.D. alleges that the furloughs constituted a change in his educational placement, and as part of his request for a due process hearing, he was entitled to remain in his then-current educational

---

[1]An individual educational program is a written statement that is developed for each disabled child and includes (1) information on the child's present level of academic achievement and functional performance; (2) a statement of annual goals and how they will be measured; (3) information on what special education services will be provided to the child; (4) an explanation of the extent to which the child will not be in class with non-disabled children; (5) statement of any accommodations necessary to measure academic achievement; and (6) the date services are to begin for the child and the approximate frequency, location, and duration of those services. 20 U.S.C. § 1414(d) (2006); *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 905 n.1 (9th Cir. 2009), *cert. denied* 130 S. Ct. 90 (2009).

placement. N.D. moved for a temporary injunction of the furloughs. The temporary injunction was denied by the district court on October 22, 2009.[2]

On November 9, 2009, the district court held a hearing on whether a preliminary injunction should be issued. The injunctive relief N.D. has sought over the course of the litigation is an end to the school furloughs as they affect the plaintiffs. Prior to the hearing, N.D. submitted evidence as to the harm suffered by the disabled children as a result of the first several furlough days. Hawaii submitted evidence that it was undertaking efforts to provide the disabled children with alternate services consistent with their IEPs.

This timely appeal followed the denial of N.D.'s motion for a preliminary injunction.

## II.

The State of Hawaii alleges that N.D. failed to join a necessary party, the HSTA. Hawaii alleges that the HSTA is a necessary party to the litigation because Hawaii negotiated a contract with the HSTA for the furlough days and a preliminary injunction would void that contract, affecting HSTA's contract rights. The district court failed to rule on this issue, therefore we review it de novo. *UOP v. United States*, 99 F.3d 344, 347 (9th Cir. 1996).

The HSTA is necessary if complete relief cannot be granted without it. FED. R. CIV. P. 19(a)(1)(A); *Altmann v. Republic of Austria*, 317 F.3d 954, 971 (9th Cir. 2002), *aff'd* 541 U.S. 677 (2004). In the alternative, we consider whether the HSTA

---

[2]District Judge Ezra was the presiding judge for the temporary injunction motion. On November 3, 2009, Senior Circuit Judge Tashima was designated the United States District Judge temporarily for the District of Hawaii for this case. Judge Tashima presided at the preliminary injunction hearing.

claims a legally protected interest in the subject of the action such that a decision without it will (1) impair or impede its ability to protect that interest; or (2) expose N.D. and the State of Hawaii to the risk of multiple or inconsistent obligations by reason of that interest. *See* Fed. R. Civ. P. 19(a)(1)(B); *Dawavendewa v. Salt River Project Agr. Imp. and Power Dist.*, 276 F.3d 1150, 1155 (9th Cir. 2002). If the HSTA satisfies either of these alternative tests, it is necessary to the instant action and must be joined. *Dawavendewa*, 276 F.3d at 1155.

**[1]** As to the first test, we have held that a "party to a contract is necessary . . . to litigation seeking to decimate that contract." *Id.* at 1157. Hawaii argues that the negotiated agreement would be voided by the injunctive relief sought by N.D. because Hawaii would have to order the teachers back to school, which Hawaii alleges violates the contract. This is premised on paragraph (3)(c) of the contract which provides that the furloughs that may be implemented are subject to the condition that "[a]ll 10 month employees *shall* be placed on furloughs for a total of 34 days over the 2009-2011 fiscal biennium." (emphasis added). Once the furloughs have been implemented, then employees are mandatorily furloughed for 34 days over two years. There appears to be no option for recalling the teachers. Forcing the State to violate the contract would render the entire contract void because the furlough provision is the whole purpose of the contract. *See Beneficial Hawaii, Inc. v. Kida*, 30 P.3d 895, 917 (Haw. 2001).[3]

**[2]** In this case, complete relief can be granted since an injunction would not render the contract illegal. An injunction would only require the schools to be open and the IEPs followed. The injunction does not order the State to order the teachers back to work nor does it declare the furloughs illegal. The furloughs are a byproduct of shutting the schools down.

---

[3]We look at state law to construe contracts. *See Island Ins. Co., Ltd. v. Hawaiian Foliage & Landscape, Inc.*, 288 F.3d 1161, 1163 (9th Cir. 2002).

N.D. does not have to prove that the contract is illegal for the injunction to issue. The question of how Hawaii decides to staff the schools when they are open and implement the IEPs is not before us. The State has not shown that an injunction would necessarily force it to violate the contract.

**[3]** Turning to the alternate test, the HSTA could be a necessary party if it claims a legally protected interest. The HSTA does not have a legally protected interest here. The negotiated agreement provides simply that Hawaii "*may* [ ] implement furloughs." (emphasis added). The furloughs are at the State's option, not the teachers'. If Hawaii had decided *not* to implement the furloughs then the teachers would have had to show up for work as usual. The HSTA interest was an iron-clad guarantee of no layoffs. This guarantee gave the State the option to furlough teachers. That interest is not affected regardless of whether the furloughs were implemented. The HSTA is not a necessary party and does not have to be joined.

### III.

Hawaii also argues that N.D. failed to exhaust all of his administrative remedies before coming to federal court. Whether exhaustion is required under the IDEA is a question of law that is reviewed de novo. *Doe v. Arizona Dept. of Educ.*, 111 F.3d 678, 681 (9th Cir. 1997).

**[4]** It is undisputed that N.D. has not exhausted his administrative remedies. He has not completed his due process hearing. Judicial review under the IDEA in a particular case is normally available only if the plaintiff exhausts her administrative remedies. 20 U.S.C. § 1415(l) (2006); *Kutasi v. Las Virgenes Unified Sch. Dist.*, 494 F.3d 1162, 1167 (9th Cir. 2007). As we have recognized previously, the exhaustion requirement:

> [R]ecognizes the traditionally strong state and local interest in education, allows for the exercise of dis-

cretion and educational expertise by state agencies, affords full exploration of technical educational issues, furthers development of a factual record and promotes judicial efficiency by giving state and local agencies the first opportunity to correct shortcomings.

*Kutasi*, 494 F.3d at 1167. However, exhaustion is not required if "it would be futile or offer inadequate relief, or if the agency has adopted a policy or pursued a practice of general applicability that is contrary to the law." *Doe*, 111 F.3d at 681 (quotation marks and citations omitted); *see Kutasi*, 494 F.3d at 1167-68.

**[5]** We have not yet addressed the issue of whether exhaustion is required in the context of a suit alleging violations of § 1415(j). All of our previous cases regarding exhaustion under the IDEA have dealt with requests for damages and not with the stay-put provision. *See Kutasi*, 494 F.3d at 1169; *Blanchard v. Morton Sch. Dist.*, 420 F.3d 918, 919 (9th Cir. 2005); *Robb v. Bethel Sch. Dist. #403*, 308 F.3d 1047, 1048 (9th Cir. 2002); *Witte v. Clarke County Sch. Dist.*, 197 F.3d 1271, 1272 (9th Cir. 1999). However, the Second Circuit addressed this precise point in *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195 (2d Cir. 2002). In *Murphy*, the plaintiff sued for a violation of § 1415(j) and requested funding to keep the disabled child in his current educational placement. *Id.* at 198-99. There, the court ruled that exhaustion of administrative remedies was not required because of the time-sensitive nature of the right § 1415(j) was designed to protect — i.e., the right to remain in the current educational placement. *Id.* at 199-200.

**[6]** We find the Second Circuit's reasoning persuasive and adopt it here. Hawaii argues that the administrative process can provide adequate relief and points to all the steps it has taken amidst the furloughs to reschedule IEP services. This argument is a non-sequitur. Hawaii's argument presupposes

that the steps it has taken will be effective and provide a comparable setting to N.D.'s current educational placement. However, the problem complained of in the suit is that the administrative agency refused to apply the stay-put provision pursuant to 20 U.S.C. § 1415(j). The claimed right is the right to maintain the disabled student's current educational placement while the judicial proceeding is ongoing to determine if the new placement is appropriate. The relief requested in the preliminary injunction is essentially the same relief provided by the stay-put provision. Exhausting the administrative process would be inadequate because the stay-put provision (and therefore the preliminary injunction) is designed precisely to prevent harm while the proceeding is ongoing. *Murphy*, 297 F.3d at 199-200. The stay-put provision recognizes the need for the child to keep her current educational placement as the administrative process tries to sort out alternatives. If the child is moved from the current placement during the process, then the deprivation of the right has occurred. The completion of the administrative process cannot remedy the harm. *Id*; *see also Cole v. Metro. Gov't of Nashville*, 954 F. Supp. 1214, 1221 (M.D. Tenn. 1997). Access to the preliminary injunction is essential to vindicate this particular IDEA right. *Murphy*, 297 F.3d at 200.

## IV.

The substantive issue is whether the district court erred in denying the preliminary injunction.[4] We review the denial of the preliminary injunction for an abuse of discretion. *Earth Island Institute v. United States Forest Service*, 351 F.3d 1291, 1298 (9th Cir. 2003). Under the newly articulated abuse of discretion standard, we "determine de novo whether the trial court identified the correct legal rule to apply to the relief requested." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). A district court that applied the incorrect legal standard necessarily abused its discretion. *Id.*

---

[4]Judge Tashima ruled from the bench and issued only an oral opinion.

at 1262. If the correct legal standard is applied then we reverse only when the district court reaches a result that is illogical, implausible, or without support in the inferences that may be drawn from the record. *Id.*

As set forth by the Supreme Court:

> plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest.

*Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008)).

N.D. alleges several errors in the district court's ruling. N.D. argues, first, that the district court applied the wrong standard and should have applied the stay-put provision's automatic injunction standard rather than the preliminary injunction standard. N.D. further argues that even if the district court did apply the correct standard, it abused its discretion in evaluating the factors. Finally, N.D. argues that the district court erred in finding that he was not likely to succeed on the merits because the furloughs did not create a change in his educational placement and therefore the stay-put provisions did not apply.

A.

**[7]** First, N.D. argues that the stay-put provision's automatic injunction should apply instead of the balancing test required for preliminary injunctions. We find this argument unpersuasive. The preliminary injunction would order the DOE to recognize the invocation of the stay-put provisions. The alleged violation is that Hawaii is not providing the pro-

tection of the stay-put provision. The claim underlying the preliminary injunction is that the stay-put provision applies. In essence, the preliminary injunction is an injunction for an injunction. While the result would be the same under both standards if relief is granted — i.e., the schools remain open and the individual students' IEPs are implemented — the legal test is different for each standard.

**[8]** N.D. relies on *Joshua A v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036 (9th Cir. 2009) to make the argument that the automatic injunction should apply. *Joshua A.* does not apply in this instance. In *Joshua A.*, the party presented its motion for stay-put directly to the Court of Appeals. *Id.* at 1037. The Court was ruling on the substance of the motion itself. Here, the motion is for a preliminary injunction that affects a stay-put invocation, not the stay-put invocation itself. *Cf. Johnson ex rel. Johnson v. Special Educ. Hearing Office, State of California*, 287 F.3d 1176, 1180 (9th Cir. 2002) (per curiam) (finding the automatic provision did not apply when the plaintiff sought an injunction for a claim regarding the validity of an existing stay-put order). The district court did not err in considering all factors of the preliminary injunction test.[5]

## B.

We now turn to the four factors of the preliminary injunction test and evaluate them one-by-one.[6] The district court

---

[5]Even if we were to hold that the stay-put provision automatic injunction standard is the relevant test, we would still have to determine the initial question of whether or not the stay-put provision even applied. This determination is the exact same determination as to whether the plaintiff is likely to succeed on the merits in this case, addressed *infra* IV.C.

[6]Hawaii alleges that the injunction is mandatory and we should apply the corresponding heightened standard for granting a mandatory injunction. A prohibitory injunction maintains the status quo whereas a mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored." *Stanley v. Univ. of S. California*, 13 F.3d 1313, 1320 (9th Cir. 1994) (citations omitted). The status

found that there was a high likelihood that plaintiffs would suffer irreparable harm. This finding was based on declarations submitted by N.D. detailing the injuries their children had suffered. N.D. demonstrated regression in his behavior, increased difficulty with activities, and outbursts of frustration and violence. The other children showed regression in behavior leading to increased aggression. To counter the allegations of harm, Hawaii submitted numerous declarations outlining the steps they were taking to minimize the disruption that the furloughs were causing. This included measures to reschedule IEP services. Specific steps were taken for the individual children as well. For example, there were proposals to extend N.D.'s school day by eighty minutes for the four days during furlough weeks or offer some IEP services in N.D.'s home. The State's declarations also indicated that N.D. and the other children were not exhibiting any changes in behavior.

[9] The declarations from the children documented their actual behavior following the furloughs, and included observations from the children's parents and from special education teachers.[7] In contrast, the declarations from the State were all

---

quo means "the last, uncontested status which preceded the pending controversy." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citation omitted). While at the time the suit was filed on October 20, 2009 the furlough contracts had been signed already, no furlough days had been taken yet. Therefore, the injunction would maintain the status quo of no furlough days and is a prohibitory injunction — not a mandatory injunction.

[7]N.D. submitted additional declarations regarding the harm suffered by the children on appeal and asked for the Court to take judicial notice of them. We decline to do so. We view only the district court record on appeal. *Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003). Judicial notice is only appropriate for matters " 'generally known within the territorial jurisdiction of the [ ] court' or 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' " *Jespersen v. Harrah's Operating Co., Inc.*, 444 F.3d 1104, 1110 (9th Cir. 2006) (en banc) (quoting Fed. R. Evid. 201). The declarations do not fall into either of the above categories. The status of the dis-

attempted ameliorative steps or were vague. Although the State submitted numerous declarations, it is hard to see how the district court abused its discretion. Based on the evidence presented to the district court, it was reasonable for the court to conclude that the furloughs would cause irreparable harm.

**[10]** Proceeding to the balance of the equities, the district court found that the balance of the equities was a "close question" and could not say that "the equities particularly tip in favor of the plaintiffs." The district court considered the money that would not have to be spent keeping the schools open, and the layoffs that might need to occur if the State did not implement the furloughs, against the harm the children were suffering as a result of the furloughs. In particular the district court noted that the furloughs were "the least bad of all the bad choices you can make." The district court did not abuse its discretion in determining that the equities were "fairly balanced."

**[11]** We now turn to the public interest. N.D. argues that the public's interest is in having the State comply with the IDEA. While it is obvious that compliance with the law is in the public interest, the district court looked to many more factors affecting the public interest. The district court noted that the public certainly did not benefit from a decrease in the number of instructional days. However, the district court considered this against the potential for increased class sizes if the State had to layoff teachers. The court noted that the deprivation of special education to the disabled children did not outweigh the decrease in educational quality related to larger class sizes. The district court ultimately concluded that

abled children is not generally known throughout the jurisdiction of the Ninth Circuit nor are the parents sources whose accuracy cannot reasonably be questioned. *See Reusser v. Wachovia Bank, N.A.*, 525 F.3d 855, 858 n.3 (9th Cir. 2008); *Turnacliff v. Westly*, 546 F.3d 1113, 1120 n.5 (9th Cir. 2008).

the public interest did not particularly favor the plaintiffs although they did "make out a strong case." This finding of fact by the district court is not an abuse of discretion either. The public interest on both sides is great and as the district court recognized, it is difficult to quantify the harm on both sides.

### C.

**[12]** What this case turns on, as the district court recognized, is N.D.'s likelihood of success on the merits of his suit. The heart of the case is whether the furloughs are a change in the educational placement of the disabled children such that the stay-put provisions apply. The question of whether § 1415(j) applies is a legal one. If N.D. can prove that he is likely to succeed on the merits — i.e., that the furloughs are a change in educational placement — then the district court arguably abused its discretion and a preliminary injunction should issue. *United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc).

**[13]** Under the IDEA, 20 U.S.C. § 1415(j) provides that "[d]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." *See also* 34 C.F.R. § 300.518(a) (2006). A parent can request a due process hearing and invoke the stay-put provision when the State proposes to change the child's educational placement. 34 C.F.R. § 300.507 (2006); 34 C.F.R § 300.503(a) (2006).

**[14]** As we have recognized, the difficulty in determining whether there has been a change lies with the lack of a definition of "current educational placement" within the IDEA. *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 902 (9th Cir. 2009), *cert. denied* 130 S. Ct. 90 (2009). We have interpreted "current educational placement" to mean "the placement set forth in the child's last implemented IEP." *Id.* We

have offered no additional guidance on the issue. N.D.'s last implemented IEP was for the 2009-2010 school year and was agreed upon before the furloughs were implemented. N.D. has not been moved from the school identified in his IEP.[8]

We have addressed changes in educational placement under the IDEA only on one prior occasion. In *Johnson ex rel. Johnson*, plaintiff's parents filed suit on behalf of their autistic child when he turned three and was to be transferred between different educational agencies. 287 F.3d at 1181. Plaintiffs alleged that under "stay-put" their child was entitled to the "*exact* same program and vendors" that were provided previously. *Id.* at 1179. We held that the IDEA does not require the exact same vendors to provide the services and transfer of the child was appropriate because the new educational agency could "meet the requirements of the 'stay put' provision by providing comparable educational placement." *Id.* at 1181. *Johnson ex rel. Johnson* provides little guidance in this case. *Johnson ex rel. Johnson* dealt with an individual child and his transfer between agencies. *Id.* This case deals with a state wide systematic change that affects all school children. *Johnson ex rel. Johnson* also dealt only with a change in vendors. *Id.* In this instance, there is no change in vendors, only a shortening of the school year.

Without a definition of educational placement in the statute or any binding precedent, we must "find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." *United States v. Alghazouli*, 517 F.3d 1179, 1184 (9th Cir. 2008) (quotation marks and citations omitted), *cert. denied* 129 S.

---

[8]N.D.'s IEP provided for various services. Some were to be measured by the amount of instruction (in minutes or hours) per week, month, or quarter. The only daily services provided were the use of visual aids and schedules, a sensory diet, and a daily communication log between school and home for all providers working with N.D.

Ct. 237 (2008). Following the Supreme Court's guidance, we have recognized that the purpose of the stay-put provision was to "strip schools of the 'unilateral authority they had traditionally employed to exclude disabled students . . . from school' and to protect children from any retaliatory action by the agency." *Johnson ex rel. Johnson*, 287 F.3d at 1181 (citing *Honig v. Doe*, 484 U.S. 305, 323 (1988)). The Supreme Court has also found that another purpose of the stay-put provision was to "prevent school officials from removing a child from the regular public school classroom over the parents' objection" which resulted from Congress's concern "about the apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special classes." *Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373 (1985). Congress was concerned with the "total exclusion" of disabled children. *Honig*, 484 U.S. at 325 n.8.

We also look to Congress's overall expressed intent in the statute. Congress has been very clear about stating its overarching goals in relation to the IDEA. Part of Congress's concern was that "children were excluded entirely from the public school system and from being educated with their peers." 20 U.S.C. § 1400(c)(2)(B) (2006). To alleviate that, disabled children were to have "access to the general education curriculum in the regular classroom, to the maximum extent possible." § 1400(c)(5)(A). We extract from the statute that the overarching goal of the IDEA is to prevent the isolation and exclusion of disabled children, and provide them with a classroom setting as similar to non-disabled children as possible.

The agency's implementation of the statute provides further insights and supports the idea that placement relates to the classroom setting. The "continuum of alternative placements" includes "instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions." 34 C.F.R. § 300.115(b)(1) (2006). The main

concern with placement is "mainstreaming" disabled children and the regulations provide that disabled children are to be educated "[t]o the maximum extent appropriate . . . with children who are nondisabled." 34 C.F.R. § 300.114(a)(2)(I) (2006). This reasonable agency interpretation of the IDEA is entitled to deference. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

Other Circuits have also attempted to divine the meaning of "current educational placement." The leading case is *Concerned Parents & Citizens for Continuing Educ. at Malcolm X (PS 79) v. New York City Bd. of Educ.*, 629 F.2d 751 (2d Cir. 1980). In *Concerned Parents*, the Second Circuit was faced with the shut down of one public school and the transfer of all handicapped children at that school to another school. *Id.* at 752. The court considered the stay-put provision of the IDEA's predecessor. The court considered the way the statute used the term "educational placement," the legislative history, and the implementing regulations. *Id.* at 754. The court held that "educational placement" referred only to "the general educational program in which the handicapped child is placed." *Id.* at 756. The children's placements were not changed because they "remain[ed] in the same classification, the same school district, and the same type of educational program special classes." *Id.* As an example, the court indicated that a transfer of a disabled child from a special class in a regular school to a special school would be a change in educational placement. *Id.* at 754.

The Fourth Circuit has also performed a more recent extensive analysis of the meaning of current educational placement under the IDEA. *A.W. ex rel Wilson v. Fairfax County Sch. Bd.*, 372 F.3d 675 (4th Cir. 2004). After looking at Supreme Court cases, the statute, implementing regulations, and other Circuits' cases, the court concluded that educational placement meant "the overall instructional setting in which the student receives his education." *Id.* at 683. *A.W. ex rel Wilson* also dealt with the transfer of an individual student between

"materially identical settings." *Id.* Based on its definition of current educational placement, the Fourth Circuit found that the disabled child's transfer did not violate the stay-put provisions. *Id.* at 683-84.

Other circuit courts have adopted similar definitions to the Second and Fourth Circuits' definitions using similar reasoning. *See, e.g.*, *DeLeon v. Susquehanna Cmty. Sch. Dist.*, 747 F.2d 149, 153-54 (3d Cir. 1984) (noting that the stay-put provision "does not entitle parents to the right to demand a hearing before a minor decision alters the school day of their children" and finding that a change in transportation services was not a change in placement); *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003) (placement does not mean a "particular school," and instead means "a setting"); *Tilton v. Jefferson County Bd. of Educ.*, 705 F.2d 800, 803-04 (6th Cir. 1983) (distinguishing *Concerned Parents* in finding a change in placement when students were transferred from a year-round school to a 180-day program); *Bd. of Educ. of Cmty. High Sch. Dist. No. 218, Cook County, Ill. v. Ill. State Bd. of Educ.*, 103 F.3d 545, 549 (7th Cir. 1996) (applying a fact-driven approach and finding that expulsion was a change in educational placement but when fiscal concerns cause a student to be transferred, the focus is on the child's general educational program); *Hale ex rel. Hale v. Poplar Bluff R-I Sch. Dist.*, 280 F.3d 831, 833-34 (8th Cir. 2002) (per curiam) (change from home to school was a change in placement); *Lunceford v. Dist. of Columbia Bd. of Educ.*, 745 F.2d 1577, 1582-83 (D.C. Cir. 1984) (change in feeding treatment not a change in placement).

**[15]** Based on Supreme Court case law, Congress's express intent in the statute, the agency's implementing regulations, and sister circuits' decisions, we hold that "educational placement" means the general educational program of the student. More specifically we conclude that under the IDEA a change in educational placement relates to whether the student is moved from one type of program — i.e., regular

class — to another type — i.e., home instruction. A change in the educational placement can also result when there is a significant change in the student's program even if the student remains in the same setting. This determination is made in light of Congress's intent to prevent the singling out of disabled children and to "mainstream" them with non-disabled children.

**[16]** Following this definition, Hawaii's teacher furloughs and concurrent shut down of public schools is not a change in the educational placement of disabled children. Similar to the children in *Concerned Parents*, the children here stay in the same classification, same school district, and same educational program. The children have not been reclassified with different handicaps. The children continue to attend the same school, have the same teachers, and stay in the same classes. The educational setting of the disabled children remains the same post-furloughs.

When Congress enacted the IDEA, Congress did not intend for the IDEA to apply to system wide administrative decisions. Hawaii's furloughs affect all public schools and all students, disabled and non-disabled alike. An across the board reduction of school days such as the one here does not conflict with Congress's intent of protecting disabled children from being singled out. In comparison to cases in which a child is singled out in relation to her peers, the furlough days do not remove the plaintiffs from the regular classroom setting anymore than they do the other children. Disabled children are not singled out for furlough days. To the extent possible under the new school calender, the disabled children are still "mainstreamed" with regular children at school. To allow the stay-put provisions to apply in this instance would be essentially to give the parents of disabled children veto power over a state's decisions regarding the management of its schools. The IDEA did not intend to strip administrative powers away from local school boards and give them to parents of individual children, and we do not read it as doing so.

Two cases could be construed as providing contrary authority to the above conclusion. In *Drinker by Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 865 (3d Cir. 1996), the Third Circuit indicated that a cut off of public funds "amount[s] to a unilateral change in placement." However, *Drinker* actually supports our conclusion because the funding cut-off contemplated there is a complete cut-off of funding for private placement, effectively eliminating private placement as an alternative setting. *Id.* Here there is no such complete cut-off. The State continues to finance the educational placement, it just does so with slightly fewer school days.

In *Tilton*, disabled children were transferred from a year-round school to 180-day programs. 705 F.2d at 804. The court ruled that such a change constituted a change in educational placement. *Id.* This case is different, as the Sixth Circuit recognized, because year-round school versus the 180-day school reflects two completely different educational programs. The two programs were not comparable. Here, however, the cut in the number of days does not change the model of education, and the educational setting and program pre- and post-furlough are comparable.[9]

Finally, plaintiffs argue that because their current IEPs are their current educational placement and assume a five day school week, the reduction of the school week constitutes a change in the general educational program of the student. While they certainly assume some five day weeks, the IEPs also assume that there are some four day weeks when there are federal and state holidays. Those four day weeks are not mentioned explicitly in the IEPs. The four day weeks created by the furloughs are no different and do not constitute changes in N.D.'s educational program.

---

[9]*Tilton* suggests that there is an exception to the IDEA for changes in educational placement that are a result of fiscal policy. *Tilton*, 705 F.2d at 804. We do not reach this question because we conclude that there has not been a change in educational placement.

Our conclusion does not mean, however, that States and school boards can make any administrative change, in terms of cutting school days, without triggering the stay-put provisions. Our holding is that under the facts of this case § 1415(j) is not triggered. Nor does our conclusion leave the parents of disabled children with no means of redress. N.D.'s claim is more properly characterized as a "material failure to implement the IEP." *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007). A school district's failure to provide the number of minutes and type of instruction guaranteed in an IEP could support a claim of material failure to implement an IEP. The agency is required to address such a claim with a due process hearing, and full judicial review is available. However, a material failure claim does not trigger the stay-put provisions. *See* 20 U.S.C. § 1415(j) (2006).

[17] We affirm the order of the district court denying plaintiff's motion for a preliminary injunction.

**AFFIRMED.**