NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0222n.06

Case No. 22-1724

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>
RITA C. SIMPSON-VLACH and ALAN SIMPSON-VLACH on behalf of A.S. and M.S.; KATHY BISHOP and CHRISTOPHER PLACE on behalf of C.P. and H.P.,<br><br>
    Plaintiffs-Appellants,<br><br>
v.<br><br>
MICHIGAN DEPARTMENT OF EDUCATION; ANN ARBOR PUBLIC SCHOOLS; WASHTENAW INTERMEDIATE SCHOOL DISTRICT; DR. JEANICE KERR SWIFT; DR. MARIANNE FIDISHIN; SCOTT A. MENZEL; NAOMI NORMAN; MICHAEL F. RICE,<br><br>
    Defendants-Appellees.
</td>
<td>
)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)
</td>
<td>
ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN<br><br><br>
O P I N I O N
</td>
</tr>
</table>

FILED
May 10, 2023
DEBORAH S. HUNT, Clerk

Before: COLE, GIBBONS, and READLER, Circuit Judges.

COLE, Circuit Judge. Rita Simpson-Vlach, Alan Simpson-Vlach, Kathy Bishop, and Christopher Place (collectively, "plaintiffs") are parents of children A.S., M.S., C.P., and H.P, all of whom qualify as students with disabilities under the Individuals with Disabilities Education Act ("IDEA"). Plaintiffs allege that the defendants, local and state education agencies and individuals employed by them, violated the IDEA, the Americans with Disabilities Act ("ADA"), and several related state laws when schools switched to remote instruction in March 2020 due to the COVID-19 pandemic. Plaintiffs also allege that the individual defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") due to their allegedly false assurances made

to ensure receipt of IDEA funds that were then misspent. Because plaintiffs have failed to allege necessary elements of constitutional standing that would permit the requested relief, we affirm.[1]

## I. BACKGROUND

In March 2020, Ann Arbor Public Schools closed their doors and transitioned students to remote learning due to COVID-19. At the time of this transition, Ann Arbor Public Schools students A.S., M.S., C.P., and H.P. each had an individualized education program ("IEP") that outlined the student-specific goals and services necessary to ensure that each student received a free appropriate public education ("FAPE") as mandated by the IDEA. *See* 20 U.S.C. §§ 1400(d), 1401(14). Notably, none of the students' IEPs in place at the time of the transition to remote learning specified whether the required services needed to be provided in-person. As with all other students in the district, A.S., M.S., and C.P. received remote instruction through May 2021, when schools re-opened for hybrid learning. H.P. participated in remote learning until January 2021 when her mother placed her in a private school. The 2021–2022 school year proceeded primarily in-person, though Ann Arbor Public Schools delayed the return to in-person learning after winter break for one week in January 2022. Since then, there has been no indication that another temporary or extended closure or period of remote instruction has occurred or will occur.

In June 2021, plaintiffs filed a putative class action complaint against the Michigan Department of Education ("MDE"), Washtenaw Intermediate School District ("WISD"), Ann Arbor Public Schools ("AAPS"), AAPS's superintendent Dr. Jeanice Swift, AAPS's Executive Director of Student Intervention and Support Services Dr. Marianne Fidishin, WISD's former

---

[1] The Supreme Court recently issued its decision in *Luna Perez v. Sturgis Public Schools*, 143 S. Ct. 859, 865 (2023). The Court explained that the IDEA's exhaustion requirement did not bar Perez's suit seeking compensatory damages under the ADA. *Id.* We decide the present case on standing principles, not exhaustion requirements, and the plaintiffs did not request compensatory damages under the ADA in their complaint. Therefore, *Luna Perez*'s holding does not impact our decision in this matter.

interim superintendent Scott Menzel, WISD's current interim superintendent Naomi Norman, and MDE's state superintendent Dr. Michael F. Rice. AAPS, Swift, and Fidishin are collectively referred to as the "AAPS defendants"; WISD, Menzel, and Norman are collectively referred to as the "WISD defendants"; and the MDE and Rice are collectively referred to as the "MDE defendants."

Plaintiffs claim that the transition to remote learning in March 2020 effected a change in placement for students with IEPs, therefore triggering several of the IDEA's procedural protections. From this premise, plaintiffs' original complaint asserted eight separate claims. The remaining claims[2] on appeal include:

- Count 1: MDE, WISD, and AAPS engaged in systemic violations of the IDEA when they transitioned to remote learning in March 2020 by failing to (1) provide parents with prior written notice of the change in educational placement, (2) provide parents with meaningful participation in decisions regarding changes to their child's IEP, (3) reconvene IEP meetings prior to or shortly following the change in placement, and (4) ensure that students with IEPs could access a FAPE on the same level as their peers without disabilities.

- Count 2: AAPS (and possibly WISD) violated the Michigan Administrative Rules for Special Education ("MARSE").[3]

- Count 4: AAPS and MDE violated Title II of the ADA.

- Count 5: AAPS violated the Michigan Persons with Disabilities Civil Rights Act.

- Count 7: Swift, Fidishin, Menzel, Norman, and Rice violated RICO.

Plaintiffs assert that they meet the requirements for a declaratory and injunctive relief class under Federal Rules of Civil Procedure 23(a) and (b)(2). But while the plaintiffs sought

---

[2] Plaintiffs' initial complaint also included Count 3: violation of Section 504 of the Rehabilitation Act, Count 6: violation of plaintiffs' Fourteenth Amendment Equal Protection rights under § 1983, and Count 8: conspiracy to violate RICO. Plaintiffs voluntarily dismissed Counts 3, 6, and 8 as to all defendants and Counts 2 and 5 as to the state defendants only.

[3] In the complaint, this count alleges that "defendants" generally failed to comply with MARSE, and later identifies AAPS and MDE specifically. As noted, Plaintiffs dismissed Count 2 against the state defendants, but made no mention of WISD.

preliminary class certification in their motion for a preliminary injunction that was then held in abeyance, no separate motion for class certification has been filed. So no class was ever certified.

Plaintiffs request various forms of relief, including that the court (1) assert jurisdiction; (2) certify a class action; (3) issue several declaratory judgments, including one indicating that the "class members' pendency placement is in-person instruction and services"; and (4) appoint two Special Monitors: (i) one to "oversee the completion of Independent Education Evaluations" for all class members and to "make expert recommendations to the Court regarding compensatory education or pendency payments for the class members to address any regressions and/or loss of competencies[,]" and (ii) another to "oversee the completion of an independent audit of defendants' expenditures of their IDEA Part B Funds from March of 2020 to the present" and ensure that any improperly spent funds "are reimbursed to a monitored account to be spent only upon review and approval by the RICO Special Monitor." (Compl., R. 1, PageID 41–43.)

While the federal litigation was pending, plaintiffs "filed four due process complaints with the State of Michigan Office of Administrative Hearings and Rules against . . . AAPS," one for each student named in the complaint. (Joint Update on Admin. Proceedings, R. 54, PageID 1427.) These administrative due process complaints similarly asserted that the transition to remote learning in March 2020 led to procedural violations of the IDEA and caused harm to students. In November 2021, plaintiffs reached settlement agreements in the administrative proceedings that acknowledged "(1) that the dispute[s] which gave rise to the Due Process Complaint[s] ha[ve] been resolved; and (2) that the Due Process Complaint[s] should be dismissed with prejudice." (Settlement Agreements, R. 54-2, PageID 1435, 1441, 1447, 1452.) Regarding additional claims, all settlement agreements state that they do not:

> [S]et forth any understanding or settlement of any of the Student's allegations regarding procedural and systemic violations under IDEA, discrimination under the

> Americans with Disabilities Act, the Michigan Persons with Disabilities Civil Rights Act, Section 504 of the Rehabilitation Act, or 42 U.S.C. § 1983, or violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

(*Id.* at 1436, 1442, 1448, 1453.) Plaintiffs' attorneys acknowledged that these agreements "achieved a full and complete settlement of all the IDEA issues, [and] all of the FAPE" issues faced by the named plaintiffs but argued that the putative class members were owed the same relief. (Hr'g Tr., R. 62, PageID 1777–78, 1800–01, 1804, 1818.)

The AAPS, WISD and MDE defendants each filed separate motions to dismiss the complaint. In response to AAPS's temporary delay in returning to in-person instruction in January 2022, plaintiffs filed a motion for a temporary restraining order. The district court held a hearing on these motions, during which the district court expressed concern about plaintiffs' Article III standing and about several elements of the RICO claims, including whether the alleged injury was one to business or property or was too derivative to permit plaintiffs to pursue their RICO claim. Following the hearing, the district court requested supplemental briefing on standing and mootness.

The district court then dismissed the case without prejudice, determining that plaintiffs failed to allege harm sufficient to warrant prospective relief for Counts 1, 2, 4, and 5 and failed to allege causation and redressability with respect to the RICO claim. Plaintiffs appeal.

## II. ANALYSIS

### A. Standing

We review issues of standing de novo. *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 523 (6th Cir. 2001). "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B.*

*Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Like any other essential element of a claim, standing must be pleaded with particularity and conclusory allegations will not suffice.  *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 344 (6th Cir. 2016).

### 1. Counts 1, 2, 4, and 5

The district court determined that the plaintiffs lacked standing with respect to Counts 1, 2, 4, and 5 because they failed to allege an injury that permitted their requested relief.  An alleged injury must be concrete, particularized, actual and imminent; it can be neither conjectural nor hypothetical.  *Gerber v. Herskovitz*, 14 F.4th 500, 505–06 (6th Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)).  To be sufficiently particularized, "an injury 'must affect the plaintiff in a personal and individual way,' not in a general manner that affects the entire citizenry." *Id.* at 506 (internal citations omitted) (quoting *Lujan*, 504 U.S. at 560 n.1).  But the injury need not have occurred in the past:  "The threat of future harm can satisfy this requirement as long as there is a 'substantial risk' that the harm will occur."  *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 405 (6th Cir. 2019) (quoting *Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 n.5 (2013)); *see also Susan B. Anthony List*, 573 U.S. at 158 (explaining that a future injury must be "certainly impending" or present a "substantial risk" of occurrence (quoting *Clapper*, 568 U.S. at 414 n.5)).  Under certain circumstances, an allegation of past injury accompanied by "continuing, present adverse effects" may also permit a plaintiff to seek declaratory or injunctive relief.  *Sullivan v. Benningfield*, 920 F.3d 401, 408 (6th Cir. 2019) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).

Importantly, plaintiffs must establish standing for each form of relief they seek, and the type of harm alleged impacts the available relief.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190,

2208 (2021); *Kanuszewski*, 927 F.3d at 406. While allegations of past injury permit a plaintiff to seek compensatory relief, allegations of ongoing or future harm permit a plaintiff to seek declaratory or injunctive relief. *Kanuszewski*, 927 F.3d at 406; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983).

Here, the complaint repeatedly requests declaratory and injunctive relief. Thus, plaintiffs must plead either a future injury that is "certainly impending" or presents a "substantial risk" of occurrence," *Susan B. Anthony List*, 573 U.S. at 158, or a past injury that presents "continuing, present adverse effects," *Sullivan*, 920 F.3d at 408 (quoting *O'Shea*, 414 U.S. at 495–96).

Beginning with the latter, plaintiffs fail to allege in Counts 1, 2, 4, or 5 continuing harm stemming from the switch to remote instruction in March 2020. Counts 1 and 2 allege that plaintiffs suffered "regressions in skills and loss of competencies regarding the goals and objectives outlined in their IEPs." (Compl., R. 1, PageID 22, ¶¶ 152, 156.) But the complaint does not indicate that these injuries are ongoing. Counts 4 and 5 allege more generally that plaintiffs experienced "harm as set forth above." (*Id.* at PageID 27, ¶¶ 184, 190.) Assuming these statements also refer to regressions in skills and loss of competencies, there is similarly no mention of ongoing impact. Therefore, plaintiffs cannot pursue declaratory or injunctive relief on these grounds.

Plaintiffs also argue that they have sufficiently pleaded risk of future harm because future school closures are likely based on the "continuing uncertainty of COVID-19 and the ever-present possibility of new variants." (Appellant Br. 7.) But an examination of two seminal Supreme Court cases explains why this allegation is too general to establish that the threatened injury is "certainly impending" rather than merely possible. *Clapper*, 568 U.S. at 409.

First, in *Lyons*, the Supreme Court concluded that Lyons did not show a sufficiently substantial risk of future harm by relying on past experience. 461 U.S. at 105–07. The Court explained that Lyons's fear of being subjected to unconstitutional practices by police officers in the future was too conjectural to establish standing to seek injunctive relief, as Lyons's claim turned on whether he would *again* be stopped for violating a traffic law *and* subject to the same use of force. *Id.* Plaintiffs' claims of future harm in the present case fare no better than Lyons's did. Here, the risk of future harm turns on a hypothetical sequence of events: that students would *again* switch to an extended period of remote instruction, that this switch would constitute a change in placement under their IEP, that the school would fail to follow the IDEA's procedural protections, and that these violations would cause harm in a similar manner. The likelihood of such a sequence of events is no more concrete than the likelihood of the events the Court deemed too speculative in *Lyons*.

Second, in *Clapper*, the Supreme Court determined that the plaintiffs' alleged future injuries were too "highly attenuated" to be "certainly impending." 568 U.S. at 410–11 (outlining the five-step sequence of events necessary to cause an actionable injury). The sequence outlined in the preceding paragraph regarding these plaintiffs' alleged injuries is comparably attenuated. Even if the plaintiffs could establish that the ever-present, ever-changing COVID-19 circumstances create a likelihood of future school closures, they fail to allege that these future transitions to remote instruction would lead to the same alleged procedural violations of the IDEA or the same regressions in skills and competencies allegedly caused by the change to remote instruction in March 2020. Plaintiffs' case is difficult to distinguish from *Lyons* and *Clapper*, so they too have not claimed an injury permitting injunctive or declaratory relief.

Plaintiffs then attempt to side-step the future injury requirement by claiming that their request for a "declaratory judgment that the class members' pendency placement is in-person" is not contingent upon a future school closure because all students must have a current placement. (Compl., R. 1, PageID 41.) This argument stems from an IDEA provision, sometimes referred to as the "stay-put" provision, guaranteeing that, "during the pendency of any proceedings conducted pursuant to this section," students "shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j); *see Honig v. Doe*, 484 U.S. 305, 308 (1988) (discussing what is now § 1415(j)). In *Honig*, the Supreme Court acknowledged that the stay-put provision is triggered when a "change in placement" exceeds ten days. 484 U.S. at 325 n.8. *Honig* did not expressly define a "change in placement," but rather accepted the Department of Education's interpretation that a school's decision to suspend a student for more than ten days qualified as one. *Id.* Reading the statute and *Honig* together, students are to remain in their current educational placement during the pendency of litigation under the IDEA and may invoke the stay-put provision when there is a change in placement that will last more than ten days.

The problem here is that plaintiffs are not asking the court to *invoke* the stay-put provision based on the current litigation or a possible change in placement that will last longer than ten days. Rather, they ask the court to *define* the students' current placement so that students are guaranteed in-person instruction "[i]f and when the stay-put provision is triggered." (Appellant Br. 16.) Plaintiffs acknowledge as much when they describe the requested relief as a way to "establish their educational placement." (*Id.*) But a court does not define a student's educational placement when it issues a stay-put order. Instead, a "student's current pendency placement is the educational placement in the student's last agreed-upon IEP." (*Id.*) *See also* 20 U.S.C. § 1415(j); *N.W. ex rel. J.W. v. Boone Cnty. Bd. of Educ.*, 763 F.3d 611, 617–18 (6th Cir. 2014) (interpreting "placement"

in light of the Department of Education's definition found at 34 C.F.R. § 300.116). Here, the plaintiffs ask the court to determine in the first instance which, if any, students' IEPs *require* in-person services, a decision a court is not in the position to make. *Cf.* 34 C.F.R § 300.116 (explaining that a child's placement is determined by "a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options"). So, plaintiffs' argument that this form of declaratory relief is not contingent upon future closures is neither persuasive nor sufficient to establish standing to proceed.

Further, it is not clear that the initial March 2020 closure would have implicated the stay-put provision. Other courts have determined that changes that affect students with disabilities and students without disabilities alike do not amount to a change in placement and do not activate the stay-put provision. *See N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1116–17 (9th Cir. 2010) ("To allow the stay-put provisions to apply [to a change that affected all students] would be essentially to give the parents of [children with disabilities] veto power over a state's decisions regarding the management of its schools."). So, even were a future closure likely, it is not clear that the closure would be considered a change of placement under the IDEA.

Additionally, plaintiffs argue that they also seek compensatory relief in the form of the appointment of a Special Monitor to make recommendations regarding compensatory education or pendency payments for putative class members based on regressions in skills resulting from the switch to remote learning in March 2020.[4] Plaintiffs argue that such "compensatory relief" depends on their reportedly successfully alleged past injury.

---

[4] An award of compensatory education is an equitable form of relief available under the IDEA. *See* 20 U.S.C. § 1415(i)(2)(C)(iii); *see also Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 315–18 (6th Cir. 2007). We read pendency payments to relate to the provision of the IDEA that authorizes reimbursement for costs associated with a unilateral private-school placement of a child who was denied a FAPE. *See* 20 U.S.C. § 1412(a)(10)(C); *Forest Grove*

But the named plaintiffs already received relief—compensatory and otherwise—through their administrative settlement agreements. Plaintiffs attempt to distinguish between the systemic violations pleaded in the putative class action and the individual violations pursued through the administrative remedy, highlighting that the settlement agreements specifically explained that they did "not set forth any understanding or settlement of any of the Student's allegations regarding procedural and systemic violations." (Reply Br. 4 (quoting Settlement Agreements, R. 54-2, PageID 1436).) But plaintiffs fail to explain how their requested relief differs from what they already received, or, proceeding on the assumption that this is a putative class action, how the case can proceed based on a hypothetical class of which the named representatives are no longer a part and about which the district court has made no findings as to class certification.

"A potential class representative must demonstrate individual standing vis-[à]-vis the defendant; he cannot acquire such standing merely by virtue of bringing a class action." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998). Moreover, when plaintiffs "receive relief before certification," as they have here, "the action, would, under the ordinary rule, become moot absent an exception." *Wilson v. Gordon*, 822 F.3d 934, 944 (6th Cir. 2016) (citing *Brunet v. City of Columbus*, 1 F.3d 390, 399 (6th Cir. 1993)); *see also United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1538 (2018) ("Normally a class action would be moot if no named class representative with an unexpired claim remained at the time of class certification." (citing *Gerstein v. Pugh*, 420 U.S. 103, 110–11(1975))). The named plaintiffs have already been compensated for the past

---

*Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009). Both of these forms of relief are distinct from compensatory damages that might be available under the ADA, which were not sought in this matter. *Cf. Luna Perez*, 143 S. Ct. at 865–66 (declining to address whether the compensatory damages sought by Perez were available under the ADA and clarifying only that the exhaustion requirement found in 20 U.S.C. § 1415(*l*) did not bar the claim).

injury claimed here, the district court has made no determinations as to class certification,[5] and plaintiffs fail to explain how any of the possible exceptions might apply that would permit a class action to proceed when the named plaintiffs have already received the requested relief. *Cf. Bd. of Sch. Comm'rs of City of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975) (determining that an action improperly certified under Rule 23(a) was moot when the named plaintiffs no longer attended the defendant school and therefore no longer had a live case or controversy); *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 537 (1978) ("Although not raised by the parties, [the mootness] issue implicates our jurisdiction."). We are not persuaded that plaintiffs can proceed under this theory because, even though they alleged a past injury, their claim is moot given that the named plaintiffs already received relief and no class has been certified. *Cf. Fox v. Saginaw Cnty.*, --- F.4th ---, Nos. 22-1265/1272, 2023 WL 3143922, at *8-9 (6th Cir. Apr. 28, 2023).

Therefore, we affirm the district court's dismissal of Counts 1, 2, 4, and 5.

*2. Count 7: RICO*

As to the RICO claim, the district court determined that, while the plaintiffs alleged an ongoing injury, they failed to show causation or redressability. To establish causation, the injury must be "fairly traceable to the challenged action of defendant" rather than the result of "the independent action of some third party not before the court." *Kanuszewski*, 927 F.3d at 412 n. 6 (cleaned up and citation omitted).

Here, plaintiffs bring the RICO claim against the individually named defendants Rice, Swift, Fidishin, Norman, and Menzel, based on their assurances to WISD, the MDE, and the U.S. Department of Education that the districts and state had the required IDEA policies and procedures

---

[5] The record indicates that the plaintiffs' motion for preliminary injunction that requested preliminary class certification was held in abeyance pending the resolution of defendants' motions to dismiss.

in place and that they "used interstate wires to defraud plaintiffs of their rights under IDEA." (Compl., R. 1, PageID 32–35.) Plaintiffs further argue that Rice, after making these assurances to the Department of Education, collected IDEA funds via wire fraud and distributed the funds to WISD, who then distributed them to AAPS. AAPS then purportedly used these funds "for unlawful purposes, including but not limited to purchasing personal protective equipment for all staff and students." (*Id.* at 38.) Finally, plaintiffs purport that MDE, WISD, and AAPS did not follow the IDEA's procedures when the schools transitioned to remote learning and as a result, plaintiffs "have been and are continuing to be deprived of their rights under IDEA" and experienced "significant regressions in skills and loss of competencies." (*Id.* at 38–39, 40.)

Plaintiffs must demonstrate that the defendants' challenged conduct (false assurances via wire fraud) is fairly traceable to the alleged injury (violation of procedural rights under the IDEA and regression in skills and competencies). But as the district court pointed out, the complaint faults the *individuals* for the false assurances, but faults *AAPS*, *WISD*, and *MDE* for the procedural violations of the IDEA and any regressions in skills and loss of competencies. (Op. & Order, R. 73, PageID 1970–71.) Plaintiffs do not contend that the individual defendants themselves took part in actions that caused the alleged injuries to plaintiffs, and so they cannot trace the defendants' challenged conduct to the alleged injury as is required to establish causation. While it is true that the claim is brought against the individuals in their official capacities, the complaint fails to explain how the defendants' roles are tied to or how the defendants are responsible for decisions related to the alleged procedural violations under the IDEA.

Even assuming causation, plaintiffs cannot show that their injury is redressable by the relief sought. To satisfy standing's redressability element, it "must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561

(quotation marks and citation omitted). Plaintiffs request appointment of a Special Monitor to (1) "oversee the completion of an independent audit of defendants' expenditures of their IDEA Part B Funds from March 2020 to the present," (2) oversee expenditures of IDEA Part B funds for 2021–2022 school year to ensure they were spent appropriately, and (3) ensure any funds spent on items other than instruction and/or services for students with disabilities are reimbursed to a monitored account and spent only with approval of the Special Monitor. (Compl., R. 1, PageID 42.)

But it is "merely speculative" that this requested relief will address the plaintiffs' purported injuries. Plaintiffs do not show how reimbursement of any misspent funds to a monitored account will make it likely that students will catch up on lost skills, be made whole for alleged IDEA procedural violations, or avoid these types of injuries in the future.

Further, even if the plaintiffs could establish constitutional standing, RICO demands that plaintiffs establish a direct injury from the predicate acts, rather than a derivative injury. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 612 (6th Cir. 2004) (citing *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267–68 (1992)). In *Anza v. Ideal Steel Supply Corp.*, the Supreme Court determined that the plaintiff could not bring a RICO claim against a competitor on the theory that the competitor was "defrauding the New York tax authority and using the proceeds from the fraud to offer lower prices designed to attract more customers," therefore harming plaintiff's business. 547 U.S. 451, 457–58 (2006). The Court explained that the "direct victim of this conduct was the State of New York," not the plaintiff, and that the harm to the plaintiff's business (allegedly caused by lower prices by the competitor) was "entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* at 458. The Court went on to reason that the defendant "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud." *Id.*

Similarly, the Court explained that the plaintiff's "lost sales could have resulted from factors other than petitioners' alleged acts of fraud." *Id.* at 459.

The same is true here. The allegedly false assurances were made to the Department of Education, not to the plaintiffs, meaning that the federal government was the direct victim, whereas the plaintiffs suffered only passed-on injuries. Moreover, defendants could have violated the procedural guarantees of the IDEA for many reasons that do not stem from the false assurances, and the plaintiffs' regression in skills could have resulted from "factors other than [defendants'] alleged acts of fraud." *Id.*

Moreover, while not binding on our court, we also note that several district courts have rejected substantially similar RICO claims. *See J.T. v. de Blasio*, 500 F. Supp. 3d 137, 165–72 (S.D.N.Y. 2020) (dismissing a RICO claim that "fail[ed] in every particular" and "reek[ed] of bad faith and contrivance"), *aff'd in part, dismissed in part sub nom. K.M. v. Adams*, No. 20-4128, 2022 WL 4352040 (2d Cir. Aug. 31, 2022), *petition for cert. docketed*, No. 22-840 (March 3, 2023); *Bills v. Va. Dep't of Educ.*, 605 F. Supp. 3d 744, 757 (W.D. Va. 2022), *appeal docketed*, No. 22-1709 (4th Cir. July 6, 2022); *Carmona v. N.J. Dep't of Educ.*, No. 21-18746, 2022 WL 3646629, at *7–9 (D.N.J. Aug. 23, 2022) (dismissing RICO claims that only pleaded an indirect harm and failed to "plead the existence of an enterprise" or requisite predicate acts with any degree of particularity), *appeal docketed*, No. 22-2874 (3d Cir. Oct. 12, 2022); *Roe v. Baker*, No. 21-11751, 2022 WL 3916035, at *6 (D. Mass. Aug. 31, 2022) (dismissing RICO claims where plaintiffs failed to meet the "bare minimum" requirements for "the litigation equivalent of a thermonuclear device" (quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)), *appeal docketed*, No. 22-1740 (1st Cir. Oct. 6, 2022).

Because plaintiffs fail to plead the necessary elements to establish standing, we affirm the district court's dismissal of the RICO claim.

## B. Mootness

Setting standing aside, the case is also moot with respect to requests for prospective relief. Students have returned to in-person learning, and the chances of another extended closure remain low. *See Resurrection Sch. v. Hertel*, 35 F.4th 524, 530 (6th Cir. 2022) (en banc) (finding a preliminary injunction to be moot because "[w]e are unlikely to see this mandate in a similar form again"). Even though the district court dismissed due to lack of standing, we may affirm based on any ground in the record. *Dixon v. Clem*, 492 F.3d 665, 673 (6th Cir. 2007) (citation omitted).

Mootness derives from Article III's case-or-controversy requirement and mandates "that there be a live case or controversy at the time that a federal court decides the case." *Sullivan*, 920 F.3d at 407, 410 (quoting *Burke v. Barnes*, 479 U.S. 361, 363 (1987)). When assessing whether a case as a whole is moot, we consider "whether there is 'a fair prospect that the [challenged] conduct will recur in the foreseeable future.'" *Resurrection Sch.*, 35 F.4th at 530 (alteration in original) (quoting *Ohio v. U.S. Evn't Prot. Agency*, 969 F.3d 306, 310 (6th Cir. 2020)).

In *Resurrection School*, we determined that a challenge to a COVID-19-related state-wide mask mandate was moot. *Id.* Specifically, we concluded that it was unlikely that a new mask mandate would be reimposed given "the changed circumstances since the State first imposed its mask mandate," including case numbers, vaccination rates, and treatment options. *Id.* at 529–30; *see also Saint Michael Acad. v. Hertel*, No. 22-1054, 2022 WL 14707052 at *2 (6th Cir. Oct. 26, 2022) (holding that challenges to an expired school shut-down order did not fall within the "capable of repetition, yet evading review" exception to the mootness doctrine because there was "no reasonable expectation or demonstrated probability that the State will reimpose a school

shutdown order"). Here, it is just as unlikely that another school closure—particularly one substantially similar to that which began in March 2020—is going to occur, let alone lead to the same alleged IDEA violations. The fact that AAPS closed its schools briefly in January 2022 does not change this outcome. A week-long delay before returning to in-person instruction is different in kind from the unprecedented closures that began in March 2020.

Interestingly, plaintiffs point to this week-long delay as evidence of the likelihood of future harm, but, at another point in their brief, they claim that the lack of additional school closures "is not probative of whether the harm is likely to recur." (Reply Br. 5.) It is difficult to see how more than eighteen months of largely uninterrupted in-person learning is not probative of whether another closure is likely to recur, while one six-day delay in January 2022 is sufficient to establish a "substantial risk" of future harm. So even if the plaintiffs alleged an injury permitting declaratory or injunctive relief, the case is now moot given that a similar school closure is not reasonably likely to recur.

## III. CONCLUSION

For the foregoing reasons, we affirm.