**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

N. E., by and through his parents
C.E. and P.E.; C. E.; and P. E.,
            *Plaintiffs-Appellants*,

v.

SEATTLE SCHOOL DISTRICT,
            *Defendant-Appellee.*

</td>
<td>

No. 15-35910

D.C. No.
2:15-cv-01659-JLR

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted May 5, 2016
Seattle, Washington

Filed November 17, 2016

Before: Susan P. Graber, Marsha S. Berzon,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge Berzon

# SUMMARY[*]

## Individuals with Disabilities Education Act

The panel affirmed the district court's denial of plaintiffs' motion for a preliminary injunction regarding a student's "stay-put" placement pending administrative proceedings under the Individuals with Disabilities Education Act.

The student had received an Individualized Education Program (IEP) that encompassed two stages. Before the start of the second stage, to which the student's parents did not agree, the family moved. The new school district proposed a class setting that was similar to the second stage of the IEP. Plaintiffs sought a "stay-put" placement consisting of the educational setting in which the student was enrolled either before the IEP or during the first stage of the IEP.

Affirming the district court's denial of injunctive relief, the panel held that a partially implemented, multi-stage IEP, as a whole, is a student's "then-current educational placement." The student's "then-current educational placement" therefore was the setting described in the second stage of his IEP.

Dissenting, Judge Berzon wrote that the majority's application of the IDEA's "stay-put" provision allowed the student to be placed in a new learning environment, more restrictive than any in which he had previously been enrolled,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

over his parents' objection, and could not be reconciled with the text of the IDEA or its purposes.

## COUNSEL

Lauren Rebecca Hruska (argued) and Charlotte Cassady, Cassady Law Firm, Seattle, Washington, for Plaintiffs-Appellants.

David T. Hokit (argued), Curran Law Firm P.S., Kent, Washington, for Defendant-Appellee.

## OPINION

GRABER, Circuit Judge:

Plaintiff N.E. is a child with a disability who, in accordance with the Individuals with Disabilities Education Act ("IDEA"), has received a series of Individualized Education Programs ("IEP"). In May 2015, three-and-a-half weeks before the 2014–15 school year ended, the Bellevue School District produced an IEP for N.E. that encompassed two stages: The first stage would begin immediately and the second would begin at the start of the 2015–16 school year. N.E.'s parents, Plaintiffs C.E. and P.E., allowed their son to finish the school year in accordance with the first stage of the IEP but did not agree to the second stage. Over the summer, the family moved to Seattle. Just before the start of the 2015–16 school year, Defendant Seattle School District proposed a class setting for N.E. that was similar to the second stage of the May 2015 IEP. Plaintiffs objected and sought a "stay-put" placement.

The pivotal issue is what "educational placement" was "then-current," 20 U.S.C. § 1415(j), after N.E.'s family moved to Seattle in the summer of 2015 but before the 2015–16 school year began. Plaintiffs contend that the "then-current educational placement" must be the educational setting in which N.E. was enrolled either before his May 2015 IEP or, in the alternative, during the first stage of the May 2015 IEP. Defendant counters that the "then-current educational placement" for the 2015–16 school year is the setting described in the second stage of the May 2015 IEP. We agree with Defendant and, accordingly, affirm the district court's denial of injunctive relief.

The relevant facts in this case are not disputed. N.E. was in the third grade at Newport Heights Elementary School in the Bellevue School District for most of the 2014–15 school year. Until the final month of that school year, and in prior school years, N.E. spent most of his instructional time in general education classes. His most recent IEP reflecting that arrangement dates from December 2014.

During the 2014–15 school year, Bellevue School District officials reported that N.E. exhibited very serious behavioral problems on a regular basis. As a result, the school district began to consider changes. An IEP meeting occurred on May 26, 2015, at which Bellevue School District officials proposed a new IEP that placed N.E. in a self-contained, special education class for students with behavioral and emotional disorders ("self-contained class"). Plaintiffs objected to that proposal and wrote "disagree" on the front sheet of the proposed IEP. Bellevue officials and Plaintiffs also discussed where to place N.E. for the remainder of the school year. Bellevue and Plaintiffs agreed that N.E. would finish the final few weeks of the 2014–15 school year at a

different school.  At that school, he would spend most of the day in a one-on-two educational setting with a teacher and a paraeducator, but with no other students ("individual class").

One day later, on May 27, 2015, the Bellevue School District produced the May 2015 IEP.  The IEP incorporated two stages:  During stage one, N.E. would finish the end of the 2014–15 school year in the agreed-upon individual class; during stage two, for the 2015–16 school year and beginning on September 1, 2015, N.E. would be placed in a self-contained class.  Plaintiffs received that IEP approximately one week later, along with a prior written notice[1] notifying Plaintiffs that the Bellevue School District intended to alter N.E.'s educational placement and that the individual class would serve as a transition to the self-contained class. Plaintiffs did not file an administrative due process challenge to the May 2015 IEP and, instead, allowed N.E. to attend the individual class until the end of the school year on June 22, 2015.

---

[1] Pursuant to the procedural requirements of the IDEA, school districts must provide parents with "[w]ritten prior notice . . . whenever the local educational agency proposes to initiate or change or refuses to initiate or change . . . the identification, evaluation, or educational placement of the child."  20 U.S.C. § 1415(b)(3)(A).

In addition to making the arguments discussed in text, Plaintiffs argue that Bellevue School District committed a procedural error, in violation of the IDEA, by sending the written notice after the school district had already implemented stage one of the May 2015 IEP.  They argue that this error prevents the May 2015 IEP from serving as the stay-put placement. But that argument was waived; Plaintiffs raised it only in a motion for reconsideration, which does not suffice to preserve the issue for appeal. *Hendricks & Lewis PLLC v. Clinton*, 766 F.3d 881, 998 (9th Cir. 2014).

Plaintiffs moved to Seattle in the summer of 2015 and contacted the Seattle School District to enroll N.E. Plaintiffs requested an individual class setting similar to the one in which N.E. had completed the prior school year.[2] The school district, however, reviewed N.E.'s records and proposed placing him in a self-contained class similar to the one embodied in stage two of the May 2015 IEP. Plaintiffs objected on September 9, 2015, and filed an administrative due process challenge. Plaintiffs also filed a "stay-put" motion, pursuant to 20 U.S.C. § 1415(j), arguing that N.E.'s stay-put placement was the general education class described in the December 2014 IEP. Defendant resisted the stay-put motion and argued that the self-contained class described in the May 2015 IEP was N.E.'s stay-put placement.[3]

An administrative law judge agreed with Defendant and determined that the self-contained class was N.E.'s stay-put placement. Plaintiffs appealed that decision and filed a motion with the district court seeking a temporary restraining

---

[2] The dissent argues that a general education class with full-time paraeducator support (the December 2014 IEP) should be considered N.E.'s stay-put placement, and it dismisses the individual class (stage one of the May 2015 IEP) as "understood by all concerned as temporary or interim," and "not reflect[ing] any considered judgment, at any point, that the temporary placement is suitable for the long-term educational development of the child." Dissent at 22–23. But N.E.'s parents, citing the recommendations of two psychologists, *requested an individual class setting* when they first contacted the Seattle School District. In other words, Plaintiffs initially sought a more isolated, not a less isolated, environment for N.E. Had the Seattle School District acceded immediately to Plaintiffs' wishes, N.E. would not have been placed in a general education class.

[3] Plaintiffs do not argue that Defendant's proposal differed meaningfully from the second stage of the May 2015 IEP.

order and a preliminary injunction. The motion sought an order requiring Defendant to place N.E. in a general education class pending the outcome of the due process challenge. The district court denied Plaintiffs' motion on the ground that they had not established a likelihood of success on the merits. Plaintiffs timely appeal.

We review the denial of a preliminary injunction for abuse of discretion. *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000). But we review legal questions, such as the meaning of a statute, de novo. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999).

The pertinent portion of the IDEA provides:

> [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall *remain in the then-current educational placement* of the child . . . .

20 U.S.C. § 1415(j) (emphasis added). The IDEA does not define "then-current educational placement." The reading most consistent with the ordinary meaning of the phrase suggests that the "then-current educational placement" refers to the educational setting in which the student is actually enrolled at the time the parents request a due process hearing to challenge a proposed change in the child's educational placement. But two conceptual difficulties complicate the analysis. First, during the hiatus between school years, it is artificial to refer to remaining in a then-current placement; literally, there is none. Second, when an IEP contains two

stages, determining the "then-current educational placement" requires one to look either backward or forward.[4]   Here is a graphic representation of the situation:



Our caselaw assists us in resolving the conundrum.  We have defined "educational placement" as "the general educational program of the student." *N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1116 (9th Cir. 2010).    More specifically, we have, in a series of cases, "interpreted 'current educational placement' to mean 'the placement set forth in the child's last implemented IEP.'" *K.D. ex rel. C.L. v. Dep't of Educ.*, 665 F.3d 1110, 1117–18 (9th Cir. 2011); *N.D.*, 600 F.3d at 1114; *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 911 (9th Cir. 2009); *Johnson ex rel. Johnson v. Special Educ. Hearing Office*, 287 F.3d 1176, 1180 (9th Cir. 2002) (per curiam).    Although the statute refers to "educational placement," not to "IEP," the purpose of an IEP is to embody the services and educational placement or placements that are planned for the child.  *See Timothy O. v.*

---

[4] It is our view that the change of school districts, in this case, does not affect the analysis.

*Paso Robles Unified Sch. Dist.* 822 F.3d 1105, 1111–12 (9th Cir. 2016) (describing the creation and elements of an IEP).

That rule does not fully resolve the dispute here, though, because the parties disagree about the status of N.E.'s "*then-current* educational placement." Plaintiffs contend that a multi-stage IEP should be viewed as containing several discrete "educational placements" and that any unrealized stage within such an IEP should be seen as an unimplemented "educational placement" that cannot serve as the stay-put placement. Thus, Plaintiffs argue, because stage two of the May 2015 IEP was never implemented, it cannot be considered the "then-current educational placement." That conclusion, according to Plaintiffs, leaves only two options as permissible stay-put placements: the individual class setting described in stage one of the May 2015 IEP or the general education setting that preceded the May 2015 IEP. Because the individual class setting was considered short-term at the time the parties created the May 2015 IEP, Plaintiffs claim that the earlier general education setting is the most appropriate stay-put placement. Defendant counters that the May 2015 IEP, as a whole, was N.E.'s "then-current educational placement" and that no legal authority precludes a multi-stage IEP or an IEP that spans a summer break.

We agree with Defendant that a partially implemented, multi-stage IEP, as a whole, is a student's then-current educational placement. A multi-stage IEP *could* be structured as several distinct IEPs, but it need not be. For example, some of our past cases assume that a single IEP may contain several phases. *See, e.g.*, *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 462–63 (9th Cir. 2015) (describing a procedural defect in a multi-stage IEP, but not criticizing the IEP for having several stages), *cert. denied*,

136 S. Ct. 1679 (2016). Plaintiffs' reading of the statute would allow students and their families to challenge the second half of any two-stage IEP when the transition occurs during a school break and would permit repeated challenges at every stage of a multi-stage IEP. We do not think that Congress intended that result.

Additionally, by the time N.E.'s parents filed their due process challenge, the second stage of the May 2015 IEP had already been scheduled to start. As noted, the May 2015 IEP provided that stage two—the self-contained placement—would begin on September 1, 2015, while N.E's parents did not request a due process hearing until September 9, 2015. Under Plaintiffs' view, parents who disagree with a new IEP could wait until it is scheduled to take effect, pull their child out of school, and then request a due process hearing after the effective date of the new IEP. The new IEP would not be "implemented" because the child is not physically present in the new setting. By this logic, the parents could then avail themselves of the stay-put mechanism to enforce the terms of a preferred old IEP during the course of the new school year while their due process challenge is litigated. Once again, we do not think that Congress intended such a result because it would undermine the cooperative process envisioned by the IDEA.

We do not suggest that Plaintiffs' request for a due process hearing was untimely; the issue here does not pertain to a statute of limitations. Rather, the question simply is how to identify the status quo when a timely challenge occurs. For example, had a one-stage IEP been completed on August 31, for a single year, had N.E. begun school on September 1, and had his parents brought their challenge a week later, the challenge plainly would have been timely; but, just as plainly,

the "stay-put" placement would have been the current (as of September 1) placement.

In short, the December 2014 IEP was superseded. The May 2015 IEP encompassed both the individual class and the self-contained class stages. Plaintiffs did not challenge the May 2015 IEP despite having had months to do so before the scheduled implementation of its second phase in September 2015.[5] The May 2015 IEP had already been implemented (and the scheduled start date for stage two had already passed) by the time Plaintiffs requested a due process hearing and, thus, was N.E.'s "then-current educational placement."

The remaining question is whether the fact that the hearing request occurred during the summer—before N.E. physically enrolled in a self-contained class like the one described in stage two of the May 2015 IEP—forces us to view stage one as the stay-put placement. We think not, for two reasons. First, and more importantly, the IEP was implemented, and stage two was always the intended setting in which N.E. would begin the 2015–16 school year, effective September 1 (before N.E.'s parents requested a due process hearing). Second, we commonly think of education as forward-looking; we refer to a child who has completed fourth grade and is about to enter fifth grade as a "rising fifth grader." The status quo at the time of the hearing request was

---

[5] We cannot fault Plaintiffs for not having objected to stage one before allowing N.E. to attend the individual class for the last few weeks of the 2014–15 school year. But we view as critical the fact that Plaintiffs never challenged the May 2015 IEP at any point before the new school year was set to begin. Had Plaintiffs done so, they likely would have been entitled to a stay-put order under the terms of the December 2014 IEP that they could have presented to the Seattle School District upon transferring there.

the anticipated entry into the self-contained program.  Stage two of the May 2015 IEP, therefore, was N.E.'s stay-put placement.

**AFFIRMED.**

BERZON, Circuit Judge, Dissenting:

I respectfully, but emphatically, dissent.

The majority applies the IDEA's "stay-put" provision to allow N.E. to be placed in an entirely new learning environment, more restrictive than any in which he had previously been enrolled, over his parents' objection.  The "stay-put" provision was designed precisely to preclude transferring students to new, more restrictive environments while their parents challenge the transfer.  None of the majority's explanations for refusing to enforce the statute's promise that children will remain in the existing placement while challenges go forward are persuasive, and each would open a large gap in the IDEA's "stay-put" assurance.

I.

The majority opinion is short on facts. The facts matter in this case.  I therefore fill in the gaps.

N.E. is an "intelligent child, [who] performs well when he desires to be engaged."  Overall, he was, as of the spring of

2015, "very strong academically.[1] He loves to read. He has a great knowledge base." He "qualifies for special education services . . . due to an ADHD diagnosis," and because he needs "specially designed instruction in Social Emotional" development.

N.E. was enrolled as a student in the Bellevue School District from kindergarten through third grade. He received special education services throughout his time there. During the 2014–15 school year, as in earlier years, N.E. received the majority of his instruction "mainstreamed" – that is, in a classroom with other children of his grade – with full time, one-on-one support from a paraeducator. This instructional setting, with associated services, was set forth most recently in his December 2014 Individualized Education Program ("IEP").

N.E. had a difficult third grade year; the parties dispute the reasons for the difficulties. In May 2015, Bellevue School District conducted a reevaluation of N.E.'s special educational needs. N.E.'s IEP team met on May 26, 2015 to discuss the reevaluation and to adopt an IEP for the 2015–16 school year. At that meeting, the Bellevue School District determined that N.E.'s educational needs had changed and proposed that N.E.'s placement be altered, to a self-contained classroom program for emotionally and behaviorally disordered students (the Cascade Program), for the 2015–16

---

[1] N.E. has scored in the 99th percentile in reading and 85th percentile in mathematics on his last standardized test.

school year.  N.E.'s parents rejected the proposed placement at the IEP team meeting, writing "disagree" on the draft IEP.[2]

Just before the May IEP meeting, the school emergency expelled N.E., due to alleged escalating aggressive behaviors at school.[3]  At the time of the meeting, N.E. was still expelled and several weeks remained in the school year.  After the full IEP team dispersed, N.E.'s parents met with their attorney, the principal, the Special Education Supervisor, and the district's attorney to discuss N.E.'s return to school following the emergency expulsion.

N.E.'s parents did not want N.E. to return to Newport Heights Elementary, as their trust in the school had been strained by the emergency expulsion.  They requested that the district pay for a private school for the approximately three

---

[2] That draft was blank on one page on which a proposed placement was to be listed.  The District had indicated its intention to fill in that page with the proposed self-contained classroom program.  The parents therefore wrote "disagree" on the cover page of the draft.

[3] An "emergency expulsion" in Washington public schools is a denial of attendance for no more than ten days, imposed while a student poses a danger or risk of substantial disruption. *See* Wash. Rev. Code 28A.600.015; Wash. Admin. Code 392-400-295.  A student who is emergency expelled does not have the right to remain in school while challenging the disciplinary action. *See* Wash. Admin. Code 392-400-295.  This state law accords with the IDEA, which allows school authorities to remove a child with disabilities who violates a code of student conduct from the classroom, to the extent they would do so for children without disabilities, for up to ten days. *See* 20 U.S.C. § 1415(k)(1)(B).

The school asserted that N.E. had gotten into a fight with his younger brother while waiting to be picked up after school. N.E.'s parents maintain that the Bellevue School District "fabricated" this incident because of hostility to N.E.

weeks remaining in the school year. After the district declined the request, N.E.'s parents and the district agreed that N.E. would attend a different public elementary school for those final days, where he would receive individualized instruction from a certified teacher with support from a full-time paraeducator. N.E. began attending that individual classroom program two days later.

This short-term solution was not mentioned at all in the text of the May 2015 IEP. Instead, the narrative stated that "[N.E.] will be served in the Cascade program, which has therapeutic social-emotional and behavior supports." A grid in the IEP, though, includes, under "Special Education and Related Services," the short-term solution the parents and the principal had arrived at, as well as the year-long self-contained classroom setting, to begin the following fall, discussed at the IEP meeting – that is, the Cascade placement to which the parents had already noted their objection.

Consistent with this sequence of events and with the Prior Written Notice,[4] both school personnel and N.E.'s parents consistently described this individual class thereafter as a "temporary" or "interim" program. The Special Education Supervisor for the Bellevue School District described this

---

[4] The Prior Written Notice sent to N.E.'s parents along with the final IEP stated as N.E.'s "current placement" "his neighborhood school with resource room support, 1:1 para[educator], and Behavior Intervention Plan." The "proposed or refused action" was "a change of placement to the Cascade Program." Under "Any other factors that are relevant to the action," the District explained that "[t]o assist with transition to the [C]ascade program . . . the team discussed that for the remainder of this school year, [N.E.] would receive 1:1 instruction provided by a certificated teacher and supported by a paraeducator in an *interim* setting at another elementary school." (emphasis added).

placement as a "temporary program to finish out the remaining few weeks of the school year," in an "interim setting." Likewise, the Seattle School District later described the program as a "temporary measure," taken because "the decision to move him to a self-contained program came near the end of the school year." N.E.'s mother also repeatedly described the individual class program as "interim."

At the time N.E.'s parents received the Prior Written Notice, they knew the family would be moving from Bellevue to Seattle during the summer, and that it was the Seattle School District that would be responsible for deciding N.E.'s 2015–16 placement. Moreover, an Independent Educational Evaluation funded by the Bellevue School District was pending at the time of the May 2015 IEP meeting. N.E.'s parents expected the results of that evaluation to inform the Seattle School District's placement decision for the next school year.

In August, N.E.'s family moved to Seattle and enrolled N.E. in the Seattle School District. The Seattle School District scheduled a Transfer Review IEP meeting with the family for September 3, before the school year started.[5] At the IEP meeting, N.E.'s parents provided the District with a letter from N.E.'s treating psychologist and the report from the then-completed Independent Educational Evaluation, both recommending against N.E.'s placement in a self-contained classroom. Nonetheless, after considering the relevant materials, the Seattle School District proposed placing N.E. in a self-contained classroom like the one adopted by the

---

[5] The Seattle School District's "Transfer Review IEP" for N.E. lists the dates of the proposed placement as September 9, 2015 to May 25, 2016, indicating that the school year started on September 9.

Bellevue School District in the May 2015 IEP. N.E.'s parents rejected the Seattle School District's proposal at the September 3 meeting and filed their due process complaint less than one week later, on September 9.

II

A.

Against this background, I turn to the question whether, as the majority holds, the statute permitted the Seattle School District immediately to place N.E., who had been "mainstreamed" in Bellevue except for the three week end-of-year agreed-upon program, in a self-contained special education classroom. I am convinced that doing so while the parents were challenging that restrictive placement violated the IDEA's "stay-put" provision.

I begin with the statute:

(i) Section 1415(j), titled "Maintenance of current educational *placement*," states:

> [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational *placement* of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j) (emphasis added). Notably, § 1415(j) uses the term "then-current educational placement," not "Individualized Education Program," as the benchmark.

Throughout the statute, the term "placement" refers to a child's on-the-ground educational experience, not the content of a document. *See, e.g.*, 20 U.S.C. §§ 1414(e); 1415(d)(2); (k)(1); (k)(3). For example, Section 1415(k)(1)(B) authorizes school personnel in exigent circumstances temporarily to remove a child who violates the code of student conduct from their "current placement" to an interim alternative setting. *Id.* § 1415(k)(1)(B). Section 1415(k)(1)(C) further provides that a school can only in narrow circumstances order a "change of placement" exceeding 10 days.[6] *Id.* § 1415(k)(1)(C). Section 1415(k)(3) provides a mechanism for a parent to challenge such a "decision regarding placement." *Id.* § 1415(k)(3). These provisions indicate parents may challenge individual *placements* without regard to whether or how they are set forth in an IEP, and so confirm that as used throughout the statute, "placement" refers to the child's actual educational experience.

The phrase "then-current educational placement," then, refers to an educational setting actually experienced by the student. "Because the term connotes preservation of the status quo, it refers to the operative placement actually functioning at the time . . . ." *Thomas v. Cincinnati Bd. of*

---

[6] N.E.'s temporary placement in the individual classroom was not made by the District pursuant to § 1415(k). Instead, the school district and N.E.'s parents agreed to place N.E. in the individual classroom as a temporary measure after his emergency expulsion, because N.E.'s parents preferred he not return to Newport Heights Elementary School for the remaining few weeks of the school year.

*Educ.*, 918 F.2d 618, 625–26 (6th Cir. 1990); *cf. N.W. ex rel. J.W. v. Boone Cty. Bd. of Educ.*, 763 F.3d 611, 617 (6th Cir. 2014) (explaining that any such operative placement cannot be one in which the parents unilaterally place their child); 34 C.F.R. § 300.116 (describing how educational placements are determined).  Consistently with this understanding, Section 1415(j) is commonly referred to as the "stay-put" provision.

(ii) The IDEA separately defines "Individualized Education Program."  An "Individualized Education Program" ("IEP") is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with this section." 20 U.S.C. § 1414(d)(1)(A). An IEP sets out a child's present educational performance and measurable annual goals, describes how progress toward those goals will be measured, and explains the special education and related services the child will receive in the future. *Id.*

The term "Individualized Education Program" ("IEP") appears in various sections of the statute. *See, e.g.*, 20 U.S.C. § 1415(c)(1)(E); (f)(1)(B)(i); (k)(1)(D)(i); (k)(1)(E)(i).  The term helps describe the role of the team responsible for establishing a child's education program; the child's documented learning goals; and the documents administrators must review when determining if a child's behavior is a manifestation of their disability.  As these uses and the definition indicate, an IEP is a "statement" – a document.  It is not the operational, on-the-ground educational setting experienced by the child.

(iii) The distinct uses of the terms "placement" and "Individualized Educational Program" throughout the IDEA

confirm that the terms refer to distinct concepts.  As the Sixth Circuit observed in *Cincinnati Bd. of Educ.*, 918 F.2d at 625, "[h]ad Congress intended a prospective IEP to govern the Act's stayput provision, as opposed to an operational placement, it could have employed the term 'individualized educational program' which it had already defined."  By using the term "placement," not "Individualized Education Program," in the stay-put provision, the IDEA evidences the intent *not* to tether the stay-put placement to a program planned for the future.[7]  Instead, the "then-current educational placement of the child" is the educational program to which the child was accustomed at the time a proposed new, never-implemented program is under challenge.

## B.

My reading of the statutory language and structure reflects the role of the "stay-put" provision in the statutory scheme.

---

[7] Our precedents are not to the contrary.  Some refer to an *implemented* IEP as the touchstone for the "stay-put" requirement.  But those cases state only that the then-current educational placement "is *typically* the placement described in the child's most recently implemented IEP," not that it always is. *Johnson ex rel. Johnson v. Special Educ. Hearing Office*, 287 F.3d 1176, 1180 (9th Cir. 2002) (per curiam) (emphasis added); *see also L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 911 (9th Cir. 2009).  None of those cases held that the child's stay-put placement was an educational setting the child never before experienced. *See Johnson*, 287 F.3d 1178–81; *Capistrano*, 556 F.3d 911–13; *K.D. ex rel. C.L. v. Dep't of Educ.*, 665 F.3d 1110, 1117–21 (9th Cir. 2011); *N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1116 (9th Cir. 2010).  Use of the shorthand term "last implemented IEP" in that line of cases thus did not encompass situations in which a future educational placement projected in an IEP never occurred.

The IDEA was first enacted in 1975 in response to evidence that disabled children were not receiving adequate educational services and that many children were "excluded entirely from the public school system and [would] not go through the educational process with their peers." Pub. L. No. 94-142, § 3(b)(4), 89 Stat. 773, (1975) (codified at 20 U.S.C. § 1401 note (1976) (Congressional Findings).[8] The IDEA prevents the unnecessary exclusion of children with special educational needs from the classrooms attended by nondisabled children ("general education classrooms"), by requiring that school districts provide to special needs children the least restrictive education setting practical. 20 U.S.C. § 1412(a)(1), (5); *Honig v. Doe*, 484 U.S. 305, 309–11, 324, 325 n.8, 327 (1988), *partially superseded by statute on other grounds*, Individuals with Disabilities Education Act Amendments of 1997, Pub. L. No. 105-17, § 615(k), 111 Stat. 37 (1997). Toward that end, the IDEA provides both a substantive guarantee that all children with disabilities will receive a free appropriate public education, 20 U.S.C. § 1412(a)(1), and procedural safeguards to ensure that result. Among those safeguards are provisions that require meaningful parent participation in all aspects of the child's education, including the right to challenge in impartial proceedings official school action. 20 U.S.C. § 1415(f)(1)(A); *see Honig*, 484 U.S. at 312.

The statute's stay-put provision complements both the substantive concern with avoiding restrictive educational environments if possible and the assurance that parents may

---

[8] The Act was originally entitled the Education for All Handicapped Children Act of 1975. It was amended in 1990 and renamed the "Individuals with Disabilities Education Act." Pub. L. No. 101-476, 104 Stat. 1103 (1990). I refer to both versions of the statute as "IDEA."

meaningfully participate in deciding on their children's educational placement. Enacted "to prevent school officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings," *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373 (1985); *see also K.D.*, 665 F.3d at 1120, the stay-put provision "meant to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students . . . ." *Honig*, 484 U.S. at 323. By doing so, the stay-put requirement eliminated the "heightened risk of irreparable harm inherent in the premature removal of a disabled child to a potentially inappropriate educational setting." *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1040 (9th Cir. 2009). Tying the stay-put provision to an actual educational setting experienced by the child – *not* a planned future placement included in an IEP statement – avoids that result.

## C.

Here, at the time N.E.'s parents brought their due process challenge on September 9, 2015, the summer break was just concluding, the 2015–16 school year was about to begin (apparently that day), and the new school district had just announced N.E.'s assignment for the coming year. In this circumstance, the IDEA's promise that parents can preserve the status quo while challenging school district actions most sensibly requires us to look for stay-put purposes to the general education classroom (with accommodations).

The two other candidates for the "stay-put" benchmark are the individual class, the stop-gap educational setting agreed to by his parents and understood by all concerned as

temporary or interim, and the Cascade Program, which N.E. had *never* attended.

As to the first, the school district and N.E.'s parents agreed that N.E. would be in the individual class for approximately three weeks, to finish the school year. As both parties now recognize, "[t]he policy behind [the stay-put provision] supports an interpretation of 'current educational placement' that excludes temporary placements . . . ." *Verhoeven v. Brunswick Sch. Comm.*, 207 F.3d 1, 10 (1st Cir. 1999). Such placements do not reflect any considered judgment, at any point, that the temporary placement is suitable for the long-term educational development of the child. In situations like this one, where the school district and the child's family do not agree to extend a temporary placement, the stay-put provision requires placing the student "in the last placement that the parents and the educational authority agreed to be appropriate." *Id.*

As to the Cascade Program, it was certainly not the "then-current educational placement" at the time N.E.'s parents challenged the Seattle District's proposed placement. N.E. had never been taught in an isolated special education classroom. To place him in one would fundamentally alter his educational experience, without his parents' consent and before the proceedings designed to prevent the "heightened risk of irreparable harm inherent in the premature removal of a disabled child to a potentially inappropriate educational setting," *Joshua A.*, 559 F.3d at 1040, could go forward.

The third alternative, placement in the general education classroom with full-time paraeducator support, is the setting in which N.E. received instruction for all but the last few weeks of the prior school year, as well as in prior years. The

May 2015 IEP identifies this setting and associated services as N.E.'s "current placement at his neighborhood school." Placing N.E. in that general education setting while his parents bring their due process challenge would fulfill the statutory "stay-put" purpose of ensuring that schools cannot unilaterally exclude children from the general educational setting. *See Honig*, 484 U.S. at 323. And it would provide stability for N.E. in his educational experience, to the degree possible given the change in school districts.

The alternative embraced by the majority – allowing Seattle to move N.E. *for the first time* to a self-contained classroom for emotionally and behaviorally disordered children – would, in contrast, fundamentally disrupt N.E.'s education. Yet, the challenge to the IEP, if successful, could result in a second disruption, returning N.E. to the general educational setting his parents seek. In the meantime, N.E. would have been educated for a long period in an inappropriate setting, in isolation from his peers. Section 1415(j) is designed to preclude precisely such disruption and such potentially long term harm to students with disabilities.

III.

The majority disagrees with my application of the IDEA "stay-put" requirement to this case. It does not contest that "then-current educational placement" ordinarily refers to the actual educational setting in which a student is enrolled. But it insists that for several reasons, the usual understanding does not apply here, and that, instead, the "stay-put" baseline is the self-contained classroom setting *which N.E. had never actually experienced.*

First, the majority maintains that the May 2015 IEP contained two stages, one of which was implemented, and that the "then-current educational placement" therefore became the never-implemented, longterm part of the IEP. Second, the majority sees significance in the timing of N.E.'s parents due process challenge – during the summer break. *Maj. Op.*, pp. 7–8.  Third, the majority indicates that N.E.'s parents brought the stay-put problem on themselves by filing their challenge to the Cascade Program when they did. Finally, the majority suggests that N.E.'s alleged disruptive behavior in the spring of 2015 justified the transfer. None of these circumstances supports the majority's conclusion that "a partially implemented, multi-stage IEP, as a whole, is a student's then-current educational placement," and that the self-contained classroom is therefore N.E.'s stay-put placement. *Maj. Op.*, p. 9.  I take in turn each of the specific circumstances of this case on which the majority relies.

A.

The majority characterizes the May 2015 IEP as a partially implemented, multi-stage IEP.  In fact, the May 2015 IEP proposed only one continuing placement, the self-contained classroom program.  On both the Prior Written Notice and in the IEP, the district stated that it was proposing a new placement for N.E. in the Cascade Program, a self-contained classroom.  The Prior Written Notice specifically referred to the individual class as an "interim" setting and did not propose the individual class as a new placement.  Instead, it noted that "to assist with [N.E.'s] transition to the cascade program at the beginning of the year," for the remainder of the current school year N.E. "would receive 1:1 instruction provided by a certificated teacher and supported by a paraeducator in an interim setting at another elementary

school." The IEP itself included the three-week interim program in the matrix of services, but it did not elsewhere describe the program. All concerned parties understood the individual classroom program to be a stop-gap measure that was distinct from the placement proposal made at the May IEP meeting. *See* pp. 15–16, *supra*. The manner in which these documents present, and the participants in the IEP decision understood, the two programs indicates that the proposed placement was the self-contained program; the one-on-one setting was a temporary, agreed-upon measure to close out the last weeks of the school year.

In the end, though, on my reading of the statute, the dispute over whether the IEP is a two-stage educational program or a one-stage, full-year program with a temporary, stop-gap placement ultimately does not matter. The "stay-put" provision, as I have explained, focuses not on what is contained in the IEP document but on the child's actual educational experience.

Here, N.E. had never experienced the self-contained classroom program the 2015 IEP proposed. A child cannot "stay-put" in a program in which he never took part; the "then-current educational placement" cannot be an educational setting the child has never experienced. From the child's point of view, moving him to an entirely new kind of educational experience, one that exists only on paper, is precisely the sort of fundamental disruption the "stay-put" provision was designed to prevent.

Moreover, permitting the school district to implement an entirely new educational program while the parents are properly challenging it allows the unilateral school district decisionmaking the IDEA does not permit. "The preservation

of the status quo [is meant to] ensure[] that the student remains in the last placement that the parents and the educational authority agreed to be appropriate." *Verhoeven*, 207 F.3d at 10.

### B.

Like the majority's concern with the nature of the IEP, the circumstance that the summer break intervened does not require departure from the stay-put provision's mandate to preserve the status quo. Even if "we commonly think of education as forward-looking," *Maj. Op.*, p. 11, the focus of the stay-put requirement is static – to *preserve* an existing educational placement until any challenge to a newly proposed one is resolved. An entirely new, future placement, never experienced by the child, is not what one would call the "current" one in ordinary language; "current" suggests continuity, not disruption.[9] As between (1) the educational placement in place at the time the IEP was devised and for the entirety of N.E.'s prior education, and (2) an educational program N.E. had never experienced, the former, most recent one (except for the three-week stop gap) has to be the "then-current" one for purposes of a provision designed to preserve the status quo and prevent disruption. Further, if school districts could unilaterally and fundamentally change a child's educational placement over the summer break because there is no "then-current" educational placement during that period, the IDEA's commitment to parental involvement in devising educational programs for disabled children would be severely undermined.

---

[9] The majority notes that we might refer to a child who is about to enter fifth grade as a "rising fifth grader." But we do not refer to that child as a "fifth grader," precisely because they have not yet started fifth grade.

C.

The majority also faults N.E.'s parents for filing their due process challenge when they did, suggesting the result might be different had the challenge been lodged earlier. But the parents filed their challenge when they did for a practical reason: N.E.'s parents did not know the Seattle School District would propose the self-contained classroom placement proposed by the Bellevue School District until the IEP meeting on September 3.

Having moved from one district to another over the summer, N.E.'s parents knew that the Seattle School District would decide N.E.'s placement for the 2015–16 school year. The statute requires that "[a]t the beginning of each school year, each local educational agency. . . shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program." 20 U.S.C. § 1414(d)(2)(A).[10]  Given the Independent Educational

---

[10] The statute also contains a section that deals with student transfers between school districts that take place within an academic year. That section provides: "In the case of a child with a disability who transfers school districts within the same academic year, who enrolls in a new school, and who had an IEP that was in effect in the same State, the local educational agency shall provide such child with a free appropriate public education, including services comparable to those described in the previously held IEP, in consultation with the parents until such time as the local educational agency adopts the previously held IEP or develops, adopts, and implements a new IEP that is consistent with Federal and State Law." 20 U.S.C. § 1414(d)(2)(C). Since N.E. did not transfer districts within the same academic year, this section does not govern his case. The Seattle School District nonetheless described N.E.'s new proposed IEP as a "Transfer Review" IEP, so it may have been under the impression that this provision applied. Whether under § 1414(d)(2)(A) or § 1414(d)(2)(C), it was clear to both school officials and N.E.'s parents that the Seattle

Evaluation report and the psychologist's letter recommending against the self-contained classroom placement, N.E.'s parents had good reason to anticipate that the Seattle School District might not propose the self-contained classroom placement in adopting the new IEP. A due process challenge against the Seattle School District before September 1 would have been premature.

The majority's focus on the September 1 date is misplaced for another reason. The Bellevue School District listed September 1 on the May IEP as the start date for the self-contained classroom placement, but the date did not correspond to the actual start of the school year in Seattle. As noted, school had not yet begun in Seattle on September 1. Because the stay-put provision requires attention to a child's actual educational experience, a projected start date in a document should not obscure the on-the-ground reality.

The majority's critique of the timing of N.E.'s parents' due process challenge leads to untoward practical consequences if accepted. The majority faults N.E.'s parents for not challenging what they call "stage one" of the IEP, a challenge which would have been meaningful only had it been brought before that stage finished. But N.E.'s parents *agreed* with the stage one placement, as an available interim measure. There is nothing in the statute requiring parents to object to a short, interim, emergency placement to which they agree so that they can challenge a later, long-term, entirely different, placement they oppose, while still benefitting from IDEA's stay-put provision.

School District had an obligation to adopt an IEP for N.E. for the beginning of that school year.

Moreover, under the majority's reasoning, for the general education setting to become the "stay-put" placement, N.E.'s parents would have had to file their due process challenge before stage one began.  But it would have been impossible for N.E.'s parents to do so here, as they did not receive the statutorily-mandated prior written notice until a week or ten days *after* N.E. began attending the interim individual class.[11] That notice was the first time in which the interim, agreed-upon setting and the self-contained classroom placement were bundled into a single IEP. Under the majority's approach, N.E.'s parents were effectively locked into both stages of the IEP by the time they saw the IEP document.

Even assuming that the parents received sufficient notice in the May meetings that the two programs would thereafter be inextricably linked – and I do not think they did – it would take some time for the parents to bring a due process challenge.  N.E. began attending the interim program only two days after the IEP meeting.  To bring a due process challenge, parents must: find and contact a competent lawyer; set up an appointment; discuss their options with the lawyer and probably between themselves; draft and file a complaint; and then assert their child's stay-put right.

Indeed, even in a situation in which parents *do* receive timely prior written notice of an IEP containing a short-term interim placement and a new placement, it is quite possible that they would not be able to file a complaint to challenge

---

[11] The majority is correct that N.E.'s parents waived their argument that the entire May 2015 IEP is invalid because they did not receive timely prior written notice.  That does not, however, change the fact that, given the tardiness of the notice, N.E.'s parents could not have filed a challenge and brought a stay-put motion before the stage one placement began.

the IEP before the first stage is implemented.  The statute requires roughly ten days' notice prior to implementation of a proposed change.  *See Letter to Winston*, 213 IDELR 102, p. 3 (Office of Special Educ. Programs 1987).  Filing a due process complaint will likely often take more than ten days.

Under the majority's rule, any time an emergency placement is proposed for rapid implementation and is attached to a longer placement in an IEP, the parents' only feasible option is to challenge both the interim and new placement before the interim placement begins.  Otherwise, they will be stuck with implementation of the unacceptable stage of the IEP while the challenge proceeds.  And doing so is likely to be difficult, given the time necessary to mount a challenge.

## D.

Finally, moving N.E. to a restrictive environment during the pendency of the due process proceedings was not necessary to address any concern about N.E.'s allegedly aggressive and violent behavior.  The IDEA provides procedures for addressing behavioral problems and safety concerns short of such unilateral action.

First, the Act provides that an IEP team "consider the use of positive behavioral interventions and supports" when a child's behavior "impedes the child's learning or that of others." 20 U.S.C. § 1414(d)(3)(B)(I).  Next, when a child with a disability violates a code of student conduct, the Act authorizes school personnel to remove that child to an alternative educational setting, or to suspend the student, for up to 10 days, to the extent such discipline would be applied

to children without disabilities. 20 U.S.C. § 1415(k)(1)(B).[12] If, after school personnel remove a child from their current placement pursuant to that authority, the IEP team determines that the problem behavior is a manifestation of the child's disability, the Act directs the IEP team to "conduct a functional behavioral assessment, and implement a behavioral intervention plan," or to review and modify an existing behavioral intervention plan to address the child's problem behavior. *Id.* § 1415(k)(1)(F). Finally, school authorities can remove a child with a disability to an alternative setting for up to 45 days when that child has a weapon, possesses or uses illegal drugs, or injures another person at school. *Id.* § 1415(k)(1)(G). If N.E.'s problem behavior recurred while he was placed in a general education classroom, these provisions would provide the Seattle School District with lawful, effective means of addressing those problems and preserving classroom safety.

* * * *

In short, although the circumstances of this case do introduce some complexity into applying the IDEA's stay-put requirement, these circumstances do not change my conclusion that N.E.'s stay-put placement is the general educational setting with individual paraeducator support he had experienced for almost all his student life.

IV.

The majority's approach simply cannot be reconciled with the text of the statute or its purposes. It confines N.E. to the

---

[12] N.E.'s "emergency expulsion" before his temporary placement in the individual class conformed with this statutory authorization.

most restrictive placement contained in any of his IEPs, removes him almost entirely from the general education setting, and places him in a setting in which he was never previously enrolled.   The majority's approach has the practical potential broadly to preclude relief to parents and their children with special educational needs.  I respectfully dissent.